Roosevelt N. Nesmith, Esq.
roosevelt@nesmithlaw.com
**LAW OFFICE OF ROOSEVELT N. NESMITH, LLC**
363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
Tel: (973) 259-6990
Fax: (866) 848-1368
*Counsel for Plaintiff/Relator*

CLERK
U.S. DISTRICT COURT
DISTRICT OF NEW JERSEY
RECEIVED

2015 JUL 31 P 1: 41

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SHANNA GEVERD, By and on Behalf of the United States of America, Relator, <br><br> Plaintiff, <br><br> v. <br><br> FINANCE OF AMERICA MORTGAGE LLC, GATEWAY FUNDING DIVERSIFIED MORTGAGE SERVICES, LP, GATEWAY FUNDING, INC., JERRY E. MCCARTHY, MICHAEL TERRUSO, SARAH MARTIN, LAWRENCE J. DEPALMA, and DEPALMA REALTY, LLC, <br><br> Defendants. | COMPLAINT FOR VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT, 31 U.S.C. §§ 3729 – 3733 <br><br> JURY DEMAND <br><br> Civil Action <br><br> Docket No.: |

Plaintiff Relator Shanna Geverd, by and on behalf of the United States of America (the

"United States" or "Government"), files this civil fraud action against defendants Finance of

America Mortgage LLC ("Finance of America"), Gateway Funding Diversified Mortgage

Services, L.L.P. ("Gateway Funding"), Gateway Funding, Inc. ("GFI", and collectively with

Gateway Funding, "Gateway"), Jerry E. McCarthy ("McCarthy"), Michael Terruso ("Terruso"),

Sarah Martin ("Martin"), Lawrence J. DePalma ("DePalma"), and DePalma Realty, LLC

("DePalma Realty" and together with Finance of America, Gateway, McCarthy and Terruso,

"Defendants") under the False Claims Act, 31 U.S.C. § 3729, *et seq.,* to recover damages

sustained by, and penalties owed to, the United States as the result of Defendants knowingly causing false claims for payment to be submitted to and paid by the Government.

## PARTIES

1. Plaintiff Relator Shanna Geverd ("Geverd") is a citizen of the United States of America. Her current address is 3117 Montana Avenue, Great Lakes, Illinois. Geverd is also the owner of property at issue in this case, located at 5758 Doris Drive, Commercial Township, New Jersey. Geverd appears by and on behalf of the United States of America in the interests of its agency the United States Department of Housing and Urban Development.

2. Defendant Finance of America is a Delaware limited liability company that maintains its principal place of business at 300 Welsh Road, Building #5, Horsham, Pennsylvania. Finance of America has offices in 42 states and the District of Columbia, including at 508 Hurffville-Crosskeys Road, Sewell, New Jersey.

3. Defendant Gateway Funding is a Pennsylvania limited partnership that maintains its principal place of business in Horsham, Pennsylvania. Gateway also maintains an office at 508 Hurffville-Crosskeys Road, Sewell, New Jersey. Gateway is licensed to do business in the State of New Jersey and transacts business in the District of New Jersey.

4. Defendant GFI is a Pennsylvania corporation that maintains its principal place of business in Horsham, Pennsylvania. GFI is the sole general partner of Gateway. As such, GFI is liable for any and all of Gateway's violations of the False Claims Act and common law.

5. Defendant DePalma Realty is a New Jersey limited liability company with an office at 111 North High Street, Millville, New Jersey.

6. Defendant Jerry McCarthy is a New Jersey licensed appraiser whose last known office address is 5070 Route 42, Turnersville, New Jersey.

2

7.     Defendant Michael Terruso is a New Jersey licensed appraiser whose office is located at 1555 Roosevelt Boulevard, Vineland, New Jersey.

8.     Defendant Lawrence J. DePalma is a New Jersey resident. He is a licensed real estate broker in the State of New Jersey. He is the owner of DePalma Realty and maintains an office at 111 North High Street, Millville, New Jersey.

9.     Defendant Sarah Martin is a New Jersey resident. She is a New Jersey licensed real estate agent and employee of DePalma Realty and maintains an office at 111 North High Street, Millville, New Jersey.

## NATURE OF THE CASE

10.    Relator Shanna Geverd brings this civil fraud action against Defendants to recover treble damages and civil penalties under the False Claims Act, 31 U.S.C. §§ 3729-3733, for harm sustained by the United States Department of Housing and Urban Development ("HUD") in connection with Gateway's origination and underwriting of residential mortgage loans endorsed for Federal Housing Administration ("FHA") insurance from July 31, 2005 to the present (the "relevant time period").

11.    During the relevant time period, Gateway Funding, a lender approved by HUD to originate and underwrite single family residential mortgage loans insured by FHA, knowingly approved loans that violated FHA rules while falsely certifying to compliance with those rules. Gateway Funding's conduct allowed it to profit from these loans, even if the borrowers defaulted on their mortgages, while placing all the risk on FHA – a risk that ultimately materialized into monetary losses to HUD. HUD would not have granted Gateway the authority to underwrite and endorse insurance on the loans for FHA insurance without its certification.

12.    McCarthy and Terruso appraised houses for Gateway and for which Gateway originated and underwrote FHA insured loans. McCarthy and Terruso were required to adhere to

3

HUD appraisal requirements in their reports and certified to having inspected the houses. Based on their inspections, McCarthy and Terruso knew or should have known that the houses were manufactured homes constructed prior to 1976 and were therefore ineligible for FHA loan insurance. Nonetheless, McCarthy and Terruso did not identify the properties as manufactured homes in the appraisals submitted to Gateway. HUD would not have insured the loans for the properties McCarthy and Terruso appraised, had it known the properties were manufactured homes constructed prior to 1976.

13.      DePalma Realty is a real estate agency that represented the sellers in both the transactions identified in this Complaint in which Gateway originated and underwrote FHA insured loans for ineligible properties. Lawrence DePalma is the owner of DePalma Realty and a real estate broker for the company. Sarah Martin is a real estate agent for DePalma Realty. Martin represented the sellers when Relator purchased her house in one improperly funded transaction addressed in the Complaint. Lawrence DePalma represented the seller when purchaser Gary Keen purchased his house in the second improperly funded transaction identified in the Complaint. In both instances, Gateway underwrote loans for manufactured houses that were ineligible for FHA mortgage insurance. In each transaction, Martin, DePalma and DePalma Realty knew or should have known the houses being sold were manufactured houses not eligible for FHA financing. In both instances, DePalma Realty knowingly withheld information material to HUD's decision to provide mortgage insurance.

14.      HUD promotes American homeownership through its "Direct Endorsement Lender" program. Lenders apply to participate in the program and are approved as "Direct Endorsement Lenders." These Lenders are authorized to approve FHA mortgage loans without HUD's prior review. Under this program, the FHA insures loans provided they satisfy certain requirements. For these loans, the FHA guarantees that mortgage holders will suffer no loss if

4

the borrower ultimately does not repay the loan.  This program encourages lenders to extend loans to creditworthy low- and moderate-income families.

15.     These Direct Endorsement Lenders are given the responsibility to determine whether loans satisfy the requirements for FHA insurance.  Because Direct Endorsement Lenders are permitted to endorse loans for FHA insurance without prior HUD review, HUD requires the lenders to conduct due diligence on loans before endorsing them for FHA insurance, and relies on the truthfulness of their loan specific certifications in extending that insurance.  As a result, the lender is expected and obligated to act with good faith, honesty, and fairness in its dealings with HUD.

16.     Gateway failed to live up to its obligations to HUD.  For example, it originated and underwrote an FHA insured loan for Relator Geverd to purchase her house in Commercial Township, New Jersey.  Geverd discovered after purchasing the house that it was a manufactured home constructed in 1971.  Gateway did not disclose to HUD at the time it underwrote the loan that it was to be used to purchase a manufactured house constructed in 1971.  FHA does not provide mortgage insurance for manufactured houses constructed prior to 1976.  HUD would not have approved the loan for FHA insurance had it known the property was a manufactured house constructed in 1971.  Geverd closed on the Gateway loan and subsequently defaulted. .  Upon information and belief, the lender submitted a mortgage insurance claim to FHA, which was paid.

17.     Gateway also originated and underwrote an FHA insured loan for Garry Keen to purchase a house in Commercial Township, New Jersey.  Keen's house was a manufactured house.  Appraiser Terruso identified the house as being constructed in 1972.  Gateway did not disclose to HUD at the time it underwrote the loan that it was to be used to purchase a manufactured house constructed in 1972.  Gateway again originated and underwrote an FHA

5

insured loan for a manufactured house that was ineligible for FHA loan insurance. HUD would not have approved the loan for FHA insurance had it known the property was a manufactured home constructed in 1972. Keen closed on the Gateway loan, subsequently defaulted and the property went into foreclosure. Upon information and belief, the lender has submitted an FHA mortgage claim for payment under the FHA mortgage insurance, which has been paid.

18.     Gateway is responsible for originating and underwriting loans on behalf of HUD for borrowers that are eligible for FHA loans. Gateway had primary responsibility for identifying the type of property that would serve as collateral for the loan, and originating and underwriting FHA loans collateralized by eligible properties. It shared responsibility for identifying the property type with the appraisers it retained, but Gateway remained primarily responsible.

19.     Gateway hired defendants McCarthy and Terruso to appraise the properties that Geverd and Keen had contracted to purchase, respectively. McCarthy and Terruso were required to follow HUD's requirements in appraising the properties. McCarthy and Terruso were also required to have the requisite skill and experience to appraise the properties. McCarthy and Terruso breached their responsibilities by not identifying the Geverd and Keen houses as manufactured houses, facts they knew or should have known had they followed HUD inspection requirements. The information McCarthy and Terruso were required to disclose, but failed to, was material to FHA insuring the Geverd and Keen loans, and paying mortgage insurance claims when the loans defaulted.

20.     Defendant DePalma Realty is a realtor in Commercial Township, New Jersey and is experienced selling real estate in the community in which Geverd and Keen purchased their houses. DePalma Realty represented the sellers in both transactions. Sarah Martin was the agent representing the owners that sold their property to Geverd. Martin and DePalma Realty

6

knew that Geverd's house was a manufactured house constructed prior to 1976 and was not eligible for FHA financing, but withheld this information. Nonetheless, it represented that the house was built in 1976 and was eligible for FHA financing—which was not the case.

21.     DePalma Realty also knew or should have known that the Keen house was a manufactured home constructed prior to 1976 and ineligible for FHA loan financing. Lawrence DePalma was the broker that represented the seller. DePalma Realty had the seller sign contracts acknowledging the sale was contingent on Keen obtaining and FHA loan. It sold the house to Keen knowing that FHA was insuring the loan.

22.     The Defendants' conduct caused improperly underwritten loans to be endorsed for FHA insurance where the loans did not satisfy HUD's requirements and where the borrowers did not repay the loans. Ineligible loans endorsed by Gateway have resulted in significant monetary losses to HUD. In addition to the specific loan defaults set forth herein, loans on manufactured housing have a historically higher rate of default than loans secured by site-built housing. Therefore, additional ineligible loans are likely to default and result in significant additional losses to HUD.

23.     HUD's underwriting requirements are designed to protect it and the taxpayers from improperly underwritten and unduly risky loans. Gateway's underwriting of ineligible loans, with the material contribution of McCarthy, Terruso, Martin, DePalma and DePalma Realty undermined these objectives, harming HUD homeowners and the housing market.

7

## JURISDICTION AND VENUE

24.     This action arises under the False Claims Act, 31 U.S.C. §§ 3729-3733. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, and 31 U.S.C. § 3730.

25.     This Court has personal jurisdiction over Finance of America because Finance of America can be found and transacts business within the State of New Jersey.

26.     This Court has personal jurisdiction over Gateway Funding because Gateway Funding can be found and transacts business within the State of New Jersey.

27.     This Court has personal jurisdiction over GFI because GFI can be found and transacts business within the State of New Jersey.

28.     This Court has personal jurisdiction over McCarthy because McCarthy can be found and transacts business within the State of New Jersey.

29.     This Court has personal jurisdiction over Terruso because Terruso can be found and transacts business within the State of New Jersey.

30.     This Court has personal jurisdiction over Martin because Martin can be found and transacts business within the State of New Jersey.

31.     This Court has personal jurisdiction over DePalma because DePalma can be found and transacts business within the State of New Jersey.

32.     This Court has personal jurisdiction over DePalma Realty because DePalma Realty can be found and transacts business within the State of New Jersey.

33.     Venue is proper in this district under 28 U.S.C. §§ 1391(b) and (c), 28 U.S.C. § 1395(a), and 31 U.S.C. § 3732(a), because Defendants can be found and transact business within the State of New Jersey.

## THE FALSE CLAIMS ACT

34.     The False Claims Act was originally enacted in the 1860s to combat fraud against the Union Army during the Civil War. It is the primary tool with which the United States combats false or fraudulent claims against the Government and protects federal funds. The False Claims Act allows private citizens to sue those that commit fraud against federal government programs on behalf of the United States. The Supreme Court has held that the False Claims Act's provisions must be construed broadly for "all types of fraud, without qualification, that might result in financial loss to the Government." *United States v. Neifert-White Co.,* 390 U.S. 228, 232 (1968).

35.     The False Claims Act provides that a person is liable to the United States for each instance in which the person knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval. *See* 31 U.S.C. § 3729(a)(1) (2006); 31 U.S.C. § 3729(a)(1)(B) (2010).

36.     The False Claims Act also makes liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B) (2010). The prior version of the false statements provision made liable any person who "knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(2) (2006).

37.     The Act defines "knowingly" to mean that a person "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(A) (2010). The False Claims Act provides that no proof of specific intent to defraud is required. *See* 31 U.S.C. § 3729(b) (2006); 31 U.S.C. § 3729(b)(1)(B) (2010).

38.     Before May 2009, the False Claims Act defined the term "claim" to include "any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded." 31 U.S.C. § 3729(c) (2006).

39.     Effective May 20, 2009, the False Claims Act now defines the term "claim" to mean, in relevant part:

> any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that – (i) is presented to an officer, employee, or agent of the United States; or (ii) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government – (I) provides or has provided any portion of the money or property requested or demand; or (II) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

31 U.S.C. § 3729(b)(2)(A) (2010).

40.     The Supreme Court has made clear that a request for payment made under a federal loan guarantee that was obtained in violation of a statute, regulation, or program requirement, by the use of a false statement, or by means of other fraudulent conduct, qualifies as a "claim" under the False Claims Act. *See Neifert-White Co.,* 390 U.S. at 232.

41.     Any person who violates the False Claims Act "is liable to the United States Government for a civil penalty of not less than [$5,000] and not more than [$11,000] . . . , plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1); 28 C.F.R. § 85.3(a)(9).

10

## FACTUAL BACKGROUND

### The FHA Mortgage Insurance Program

42.     HUD is a cabinet-level agency of the United States. Its mission is to create strong, sustainable communities and quality affordable homes for all. HUD works to strengthen the housing market to bolster the economy and protect consumers, meet the need for quality affordable homes and utilize housing as a platform for improving quality of life.

### The Federal Housing Administration

43.     FHA is a part of HUD and is one of the largest mortgage insurers in the world. Pursuant to the National Housing Act of 1934, 12 U.S.C. §§ 1703, *et seq*. (the "National Housing Act") FHA offers mortgage insurance programs that have insured more than 40 million home loans since FHA's inception. Through some of these mortgage insurance programs, FHA provides insurance against losses on mortgage loans to single family homebuyers originated and held by approved lenders, or mortgagees.

### FHA Mortgage Insurance

44.     If a homeowner defaults on an FHA-insured mortgage, the holder of the mortgage may submit a claim to HUD. HUD will then pay the mortgage holder the outstanding balance on the loan and other costs associated with the default. The mortgage holder suffers no loss when a borrower is unable to repay an FHA-insured mortgage. This no-loss guarantee encourages lenders to make loans to creditworthy applicants who would otherwise have difficulty qualifying for conventionally available financing on favorable terms, including the ability to put little money down to make the purchase. FHA mortgage insurance programs therefore help many low- and moderate-income families to become homeowners.

11

## HUD Mortgage Insurance For Manufactured Homes

45.     HUD works to fulfill its commitment to expand homeownership by also insuring loans used to purchase manufactured homes. Manufactured homes are sometimes known as "mobile homes." Manufactured homes had limited financing options prior to 1969. Manufactured homes were treated as personal property under most state laws, not real property. Therefore, lenders would only grant personal property, or chattel, mortgages loans – akin to automobile loans.

46.     HUD began to offer FHA insurance for manufactured home chattel mortgages pursuant to Title I of the National Housing Act in 1969. HUD Title I loans were limited to amounts no greater than $48,600 and loan amortization periods averaged 15 years. Interest rates on the loans were 1-2% higher than for comparable real property mortgage loans. FHA Title I loans were the only FHA insured loans available for manufactured homes prior to 1980.

## HUD Insures Manufactured Homes Constructed Pursuant to HUD Codes

47.     Congress authorized HUD to promulgate regulations for the construction of manufactured homes pursuant to the National Manufactured Housing Construction and Safety Standards Act of 1974, 42 U. S. C. §5401-5426 *et seq*. (the "Act"). As a result, HUD promulgated the Manufactured Home Construction and Safety Standards, 24 C.F.R. §§ 3280, *et seq*. (the "HUD Codes"), which became effective June 15, 1976. All manufactured homes constructed on or after June 15, 1976 are required to comply with the HUD Codes. Id. Prior to promulgation of the HUD Codes there were no federal standards for the construction of manufactured homes.

48.     The HUD Codes are the industry-wide standards all manufacturers must follow in producing manufactured homes. HUD defines manufactured homes, in relevant part, as:

> a structure, transportable in one or more sections, which in the traveling mode is 8 body feet or more in width and 40 body feet or more in length or which when erected on site is 320 or more square feet, and which is built on a permanent chassis and designed to be used as a dwelling with or without a permanent foundation when connected to the required utilities, includes the plumbing, heating, air conditioning and electrical systems contained in the structure, and designed and built in compliance with the federal Manufactured Home Construction and Safety Standards ("HUD Codes"), effective June 15, 1976.

*See* 24 C.F.R. § 3280.2.[1]

49.    All manufacturers are required to demonstrate compliance with the HUD Codes

by affixing two forms of identification plates to all Manufactured Homes:

a.    A **Data Plate** affixed near the main electrical panel or other readily accessible and visible location. The Data Plate must include, among other things: (1) the name and address of the manufacturing plant which produced the manufactured home; (2) the serial number and model designation of the unit and the date it was manufactured; and (3) the statement: This manufactured home is designed to comply with the Federal Manufactured Home Construction and Safety Standards in force at the time of manufacture.

b.    A **Certification Label** affixed to each transportable section of each manufactured home, which shall be separate and distinct from the Data Plate and which includes, among other things, the manufacturer's certification that to the best of its knowledge and belief, the manufactured home has been inspected in accordance with the requirements of the HUD Codes. The Certification Label is required to be a 2"x 4" metal plate, permanently attached to the manufactured home by means of 4 rivets, drive screws or other means that render it difficult to remove without defacing it.

24. C.F.R. §§ 3280.5, 3280.11.

50.    HUD requires confirmation that the HUD Data Plate and the HUD Certification

Label are in place, or that the lender obtain the information required by the identification plates,

to underwrite a Manufactured Home loan. In the absence of the required information, the lender

---

[1] Although the terms "manufactured homes" and "mobile homes" are at times used interchangeably, the term "Mobile Home" when used herein refers to manufactured homes constructed prior to the effective date of the HUD Codes, June 15, 1976, and the term "Manufactured Home" refers to manufactured homes constructed on or after June 15, 1976, in compliance with the HUD Codes.

cannot certify that the dwelling was manufactured in accordance with the HUD Codes. In addition, if the dwelling is a Mobile Home (i.e., a manufactured home constructed prior to June 15, 1976) it does not meet the HUD requirements and is not eligible for FHA insurance.

51.      Promulgation of the HUD Codes was the linchpin for the increased availability of real property mortgage financing for Manufactured Homes. HUD began to insure real property loans for the purchase of Manufactured Homes, when it advised lenders that then existing permanently sited double wide Manufactured Homes would be treated as any other existing property for insurance eligibility purposes in 1980. The following year it advised lenders that new construction of double-wide Manufactured Homes would be eligible for insurance provided they met the HUD Codes and HUD foundation requirements. 48 Fed. Reg. § 7731, *see also* 24 C.F.R. § 203.434.

52.      HUD issued formal regulations directed to the eligibility of Manufactured Homes for mortgage insurance for Title II loans in 1983. The regulations expressly stated that HUD was extending eligibility for mortgage insurance pursuant to Title II of the Act to manufactured homes constructed in accordance with the HUD Codes and permanently affixed to a permanent foundation that meets HUD's Minimum Property Standards. 48 Fed. Reg. § 7731.

## HUD Does Not Insure Mobile Home Loans

53.      HUD does not insure loans for Mobile Homes, i.e., manufactured homes constructed prior to the effective date of the HUD Codes. HUD ceased insuring Mobile Home chattel mortgage loans originated by private lenders after enactment of the HUD Codes. HUD no longer offers FHA insurance in any form for Mobile Homes and it did not do so during the relevant time period.

14

## HUD Relies on Lenders to Comply with Their Fiduciary Obligations

54.     A lender must apply to and be approved by HUD to participate in the FHA Direct Endorsement program. As a Direct Endorsement Lender, the approved lender is authorized to underwrite FHA-insured mortgage loans on HUD's behalf. It is a significant responsibility because HUD "does not review applications for mortgage insurance before the mortgage is executed." 24 C.F.R. § 203.5(a). Instead, the Direct Endorsement Lender underwrites the mortgage loans on HUD's behalf. In underwriting the mortgage loan, the Direct Endorsement Lender must determine whether the borrower and collateral meet HUD's requirements for FHA insurance and whether the "proposed mortgage is eligible for insurance under the applicable program regulations." Id. The Direct Endorsement Lender decides whether to approve the borrower for an FHA-insured mortgage loan.

55.     After the Direct Endorsement Lender approves a borrower for an FHA-insured mortgage loan, the lender may submit the loan to HUD to "endorse" the loan for FHA insurance, meaning that the loan is fully insured by the FHA insurance fund in the event that the borrower cannot repay the loan. The Direct Endorsement Lender must certify that the loan meets all of HUD's requirements and HUD relies on this certification to endorse the loan for FHA insurance.

56.     Direct Endorsement Lenders may also participate in the Lender Insurance program in which the lenders themselves endorse the FHA insurance and retain all documentation supporting the mortgage. 24 C.F.R. § 203.6. In doing so, the lender retains the documents necessary to approve the loan (the FHA "case binder") and remits the documents to HUD only upon request. See Mortgagee Letter 2005-36.

57.     A Direct Endorsement Lender is expected and obligated to act with the utmost good faith, honesty, and fairness in its dealings with HUD. "Under the . . . civil case law the mortgagee, knowing that the federal insurer is 'relying on its professional judgment in a business

15

relationship' has an affirmative duty 'to use due care in providing information and advice' to the federal mortgage guarantor." *United States v. Bernstein*, 533 F.2d 775, 797 (2d. Cir. 1976), *citing 1st Nat'l Bank, Henrietta v. Small Bus. Admin.,* 429 F. 2d 280, 297 (5th Cir. 1970); Mt. *Vernon Coop. Bank v. Gleason*, 367 F. 2d 289, 293 (1st Cir. 1966). As a result, in addition to the regulatory duties addressed below, the Direct Endorsement Lender owes both a fiduciary duty and a duty of reasonable care to HUD.

## Lenders Must Submit Truthful Certifications

58.     The success of the Direct Endorsement Program depends upon proper underwriting of loan files. Direct Endorsement Lenders have to not only determine the eligibility of loans for FHA insurance, they must also ensure the integrity of the data relied upon to make such determinations.

59.     HUD relies on the expertise and knowledge of the Direct Endorsement Lenders. HUD also relies on the truthfulness of the certification the lender completes on each loan, certifying that the loan is eligible for FHA insurance. As HUD has explained, these "certifications are important as HUD will rely upon them for purposes of endorsing the mortgage loan, thereby eliminating the necessity for a detailed HUD review of the loan prior to endorsement." Final Rule, Mutual Insurance Programs Under the National Housing Act; Direct Endorsement Processing, 48 Fed. Reg. 11928, 11932 (March 22, 1983).

## Lenders Must Use Qualified Underwriters

60.     To obtain and maintain its status as a Direct Endorsement Lender, a lender must have qualified underwriters on staff. To qualify as a Direct Endorsement underwriter or "DE underwriter," an underwriter must satisfy several requirements. The DE underwriter "must have a minimum of three years full-time recent experience (or equivalent experience) reviewing both credit applications and property appraisals." HUD Handbook 4000.4, REV-1, CHG-2, Ch. 2-

16

4.A.3; *see also* HUD Handbook 4155.2 Ch. 2.A.4a. The underwriter must also be a "reliable and responsible professional skilled in mortgage evaluation" and " must be able to demonstrate his or her knowledge and experience regarding the principles of mortgage underwriting." HUD Handbook 4000.4, REV-1, CHG02, ch. 2-4.A.1; *see also* HUD Handbook 4155.2 ch. 2.A.4a.

61.     These requirements are intended to ensure that FHA-insured loans are underwritten only by qualified individuals who are knowledgeable and experienced regarding FHA requirements, and that the decision to endorse the loan is based on the eligibility of the mortgage, rather than the financial interest of the underwriter.

## Lenders Must Perform Proper Due Diligence And Ensure Accuracy

62.     A Direct Endorsement Lender is responsible for all aspects of the mortgage application, the property analysis, and the underwriting of the mortgage. That responsibility includes performing due diligence and ensuring accuracy.

63.     Proper due diligence is a critical component of the Direct Endorsement Program. Federal regulation and HUD Handbooks require it. It is also required by virtue of the fiduciary duty and duty of reasonable care that the Direct Endorsement Lenders owe to HUD. *See* 48 Fed. Reg. at 11932. ("The duty of due diligence owed [HUD] by approved mortgagees is based not only on these regulatory requirements, but also on civil case law."). "The entire scheme of FHA mortgage guaranties presupposes an honest mortgagee performing the initial credit investigation with due diligence and making the initial judgment to lend in good faith after due consideration of the facts found." *Bernstein*, 533 F.2d at 797.

64.     A lender's due diligence should (1) "determine a borrower's ability and willingness to repay a mortgage debt, thus limiting the probability of default and collection difficulties"; and (2) "examine the property offered as security for the loan to determine if it

17

provides sufficient collateral." HUD Handbook 4155.1A.1.a. Proper due diligence thus requires a scrupulous evaluation of, among other things, a borrower's collateral. *Id.*

65.    HUD has established specific rules for due diligence predicated on sound underwriting principles. In particular, HUD requires Direct Endorsement Lenders to be familiar and to fully comply with governing HUD Handbooks and Mortgagee Letters, which provide detailed instructions and requirements for Direct Endorsement Lenders. These requirements set forth "the minimum standard of due diligence in underwriting mortgages" with which Direct Endorsement Lenders must comply. *Id.*

66.    HUD considers the Direct Endorsement underwriter to be "the focal point of the Direct Endorsement program." HUD Handbook 4000.4, REV-1, CHG-2, ch. 2-4.C. The Direct Endorsement underwriter must assume the following responsibilities:

- Compliance with HUD instructions, the coordination of all phases of underwriting, and the quality of decisions made under the program;

- The review of appraisal reports performed by fee and staff personnel to ensure reasonable conclusions, sound reports and compliance with HUD requirements;

- The decisions relating to the acceptability of the appraisal and the overall acceptability of the mortgage loan for HUD insurance;

- The monitoring and evaluation of the performance of fee and staff personnel used for the Direct Endorsement program; and

- Awareness of the warning signs that may indicate irregularities, and an ability to detect fraud, as well as the responsibility that underwriting decisions are performed with due diligence in a prudent manner.

*Id.*

67.    The underwriter must "have the property appraised in accordance with [the] standards and requirements" prescribed by HUD. *See* 24 C.F.R. § 203.5(e). "The mortgagee's underwriter is to review the appraisal to determine whether or not the appraiser's conclusions are

18

acceptable. If found to be acceptable, the property is eligible for HUD mortgage insurance."
HUD Handbook 4000.4, REV-1, CHG-2, ch. 3-3.G; *see also* HUD Handbook 4155.2, ch.4.1.b
(May 9, 2009)("Lenders are responsible for properly reviewing appraisals and determining if the
appraised value used to determine the mortgage amount is accurate and adequately supports the
value conclusion.") The underwriter's review includes verification, as possible, that the factual
information submitted is correctly reported, as well as determination of the plausibility and
consistency of the conclusions based on the data presented in the appraisal. *See* HUD Handbook
4000.4, REV-1, CHG-2, ch.3-3.G.

68.     A Direct Endorsement Lender is "equally responsible, along with appraisers, for
the quality, integrity, accuracy and thoroughness of appraisals. The lender will be held
accountable if it knew or should have known that there were problems with the integrity,
accuracy and thoroughness of an appraisal submitted to FHA for mortgage insurance purposes."
HUD Handbook 4155.24.1.b, Mortgagee Letter 1994-54 ("must accept responsibility, equally
with the appraiser, for the integrity, accuracy, and thoroughness of the appraisal, and will be held
accountable by HUD for the quality of the appraisal").

69.     The appraisal is important to eligibility for FHA insurance because, among other
reasons, HUD limits the types of properties that may serve as collateral for its loan programs.
For example, HUD does not provide mortgage insurance for Mobile Homes -- manufactured
homes constructed prior to June 15, 1976. HUD mortgage insurance for Manufactured Homes
constructed pursuant to the HUD Codes, is available under certain loan programs with specific
loan underwriting requirements. Therefore, the lender must identify manufactured homes, when
they were constructed and adhere to specific underwriting requirements. *See* 24 C.F.R. §
203.5(a)("[T]he mortgagee determines that the proposed mortgage is eligible for insurance under
the applicable program regulations").

**Appraisers Must Adhere to HUD Inspection Requirements**

70.     The appraisal process is the lender's tool to determine that a property meets FHA

eligibility standards. *"Underwriters bear primary responsibility for determining eligibility;*

*however, the appraiser is the on-site representative for the lender and provides preliminary*

*verification that the General Acceptability Criteria have been met."* HUD Handbook 4150.2

(Appendix D)(emphasis in original); *see also*, HUD Handbook 4155.2 4.1o ("The underwriter

bears primary responsibility for determining eligibility of a property for FHA insurance.")

71.     HUD sets forth specific appraisal requirements to which appraisers must adhere.

HUD Handbook 4150.2.3-0. The appraiser must certify to having "knowledge and experience in

appraising [the] type of property. HUD Handbook 4150.2 (Appendix D).

72.     HUD requires that appraisers make a complete interior and exterior visual

inspection of the subject property. HUD Handbook 4150.2 3-1. The appraiser's inspection must

include the basement or crawl space. The appraiser must examine all areas of the crawl space,

which must include confirming (i) that the floor joists are sufficiently above-ground to provide

access to maintain and repair ductwork, (ii) that the crawl space is clear of all debris and properly

vented and (iii) that it is not excessively damp or have ponding water. *Id., see also* HUD

Handbook 4150.2 Sec. 5. *See also*, HUD Handbook 4150.2 (Appendix D)("If unable to

evaluate improvements in their entirety, contact the lender and reschedule a time when a

complete visual inspection . . . can be completed. This includes access to the crawl space[.]")

73.     The HUD requirement that appraisers inspect basements and crawlspaces is

material to identifying a Mobile Home or a Manufactured Home. Mobile Homes and

Manufactured Homes are constructed on permanent chassis. The chassis and prefabricated joists

that are integral to manufacture houses are readily observed from the basement or crawlspace.

Thus, inspection of the basement or crawl space in a manner consistent with HUD requirements

should reveal to an experienced appraiser, by the presence of the chassis, that the structure is a Mobile Home or a Manufactured Home.

## Direct Endorsement Underwriting Procedures

74.     Direct Endorsement Lenders can underwrite an FHA-insured loan in one of two ways. First, a DE underwriter can "manually underwrite" the loan, by making the credit decision whether to approve the borrowers, in accordance with HUD underwriting rules. Second, the Direct Endorsement Lender can use a HUD-approved Automated Underwriting System (AUS), a software system that makes the recommendation whether to approve the borrower.

## Direct Endorsement Electronic Underwriting

75.     Beginning in July 2008, HUD required Direct Endorsement Lenders to electronically process eligible loan requests through an AUS. The AUS is a software program that connects to a proprietary HUD algorithm known as Technology Open to Approved Lenders, or "TOTAL." Using the data input by the lender, HUD's "TOTAL" algorithm makes a credit determination and either: (i) provides an "Accept" decision, approving the loan subject to certain conditions; (ii) provides an "Accept/Ineligible" recommendation, which means TOTAL has determined that the borrower's credit meets TOTAL's threshold, but the borrower does not meet certain FHA program eligibility requirements; or (iii) provides a "Refer" decision, referring the loan back to the lender for manual underwriting. When TOTAL approves the loan, the approval is conditioned on the lender completing certain additional underwriting steps. Many of these conditions relate to ensuring the data the lender entered is true, complete, and accurate. Direct Endorsement Lenders using TOTAL remain solely responsible for the underwriting decision. FHA TOTAL Mortgage Scorecard User Guide, (January, 2013 Edition) at 4.

76.     Direct Endorsement Lenders are required to analyze the TOTAL Accept/Ineligible feedback and determine the reason for the ineligibility. A typical reason is that

21

the submitted Property Type does not correspond to the section of the Act selected in the AUS. *See* FHA TOTAL Mortgage Scorecard User Guide, ch. 2.2.2. (January 2013 Edition). The Direct Endorsement Underwriter must identify in the AUS whether the Property Type is (i) a single family dwelling of 1 to 4 living units; (ii) a manufactured home meeting requirements for the Title II mortgage insurance program, or (iii) units in low and high rise condominium projects. FHA TOTAL Mortgage Scorecard User Guide, ch. 1.4.3. Based upon the Direct Endorsers input, the AUS may determine that the Property Type is not eligible for the loan program selected by the Direct Endorsement underwriter.

77.     For any loan approved through the use of AUS, HUD requires the lender to certify to the integrity of the data it entered, which HUD defines as data that is true, complete and accurate. FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch. 2.

78.     The data entered into TOTAL is material to the endorsement of the loan because TOTAL is an algorithm that evaluates the overall creditworthiness of a mortgage applicant and its result are based on the data supplied by the lender. Therefore, a loan approved by TOTAL is only eligible for FHA's insurance endorsement if "the data entered into the AUS are true, complete, properly documented, and accurate." *See* FHA TOTAL Mortgage Scorecard User Guide (December, 2004 Edition), ch.2. It is the Direct Endorsement Lender's responsibility to ensure the integrity of the data relied upon by TOTAL. *See* Mortgagee Letter 2004-1.

### Direct Endorsement Lenders Must Certify Property Eligibility

79.     Direct Endorsement Lenders are authorized to originate and underwrite FHA insured mortgages for Manufactured Homes that meet the requirements for Title II mortgage loans. FHA TOTAL Scorecard, 1.4.3.   In underwriting a Manufactured Home loan, the Direct Endorsement Lender must determine the mortgage loan meets HUD requirements for FHA

22

insurance and "the proposed mortgage is eligible for insurance under the applicable program regulations." 24 C.F.R. § 203.5(a).

## Manufactured Homes Require HUD Specified Appraisals

80.     To underwrite an FHA Title II loan for a Manufactured Home, the Direct Endorsement underwriter must have the Manufactured Home appraised in accordance with HUD requirements. HUD requires that the appraiser, informed by experience and expertise, select the appropriate appraisal reporting form for the type of property that will be appraised. HUD Handbook 4150.2 Appendix D. There are four approved appraisal reporting forms: (i) Uniform Residential Appraisal Report; (ii) the Manufactured Home Appraisal Report; (iii) the Individual Condominium Unit Appraisal Report; and (iv) the Small Residential Income Property Appraisal Report. *Id.*

81.     The Manufactured Home Appraisal Report requires the appraiser to provide information unique to Manufactured Homes. The appraiser must include the manufacturer's name, model name, serial number and date of manufacture from the HUD Data Plate. If the HUD Data Plate is missing or the appraiser cannot locate it, that fact must be reported. The appraiser must also locate the HUD Certification Label. If the HUD Certification Label cannot be located, that must also be reported to the lender. The completed Manufactured Home Appraisal Report provides the information the underwriter requires to qualify the Manufactured Home for FHA mortgage insurance pursuant to the HUD regulations. Id. *See also* 24 C.F.R. § 203.43.

82.     The Manufactured Home Appraisal Report requires the appraiser also determine the type of foundation construction, the square footage of the basement, whether there is interior or exterior access, confirm that the design of the permanent foundation complies with FHA

23

criteria as evidenced by an engineer's certification and confirm that the towing hitch, wheels and

axels have been removed.  *Id.* at D-2.

### Manufactured Home Loans Require Additional Loan Documentation

83.    HUD also requires the Direct Endorsement Lender fulfill specific documentation

requirements for FHA insured Manufactured Home transactions.  HUD requires that all

mortgage and promissory notes conform to the requirements of Fannie Mae as to form and

content[2].  HUD Handbook 4001.1.  Fannie Mae requires that loan documentation for

Manufactured Homes include, among other things:

- The property description section of the security instrument [mortgage] must
  include a comprehensive description of the manufactured home and the
  land. The description must include the serial or VIN number (or the serial
  number or VIN for each unit if the home is multi-width), make, model,
  size, and any other information that may be required by applicable law to
  definitively identify the home. The serial number is located on the HUD
  data plate located on the interior of the home, usually near the electrical
  box. In addition, the serial number is generally cold stamped on the frame
  front cross member of each transportable section.

- Some jurisdictions may not allow any information in the property section of the
  security instrument other than what is customary for other real property transactions. If
  this is the case, then an addendum maybe used, which must be attached to the security
  instrument and included in the loan file.

- The security instrument must state that the manufactured home is an improvement to
  the land and an immovable fixture, or must include similar language as may be
  required by applicable law to be sure, to the greatest extent possible, that the
  manufactured home is treated a real property under applicable state law. If
  applicable law provides specific obligatory wording, such wording must be used.

- The borrower and the lender must sign an Affidavit of Affixture that acknowledges
  their intent for the manufactured home to be permanently part of the real property that
  secures the mortgage and contains any specific language that may be required by
  applicable law.

---

[2] Fannie Mae purchases loans secured by manufactured homes built in compliance with the Act and the
HUD Codes. Fannie Mae Selling Guide, B2-3-02

- The affidavit must be signed by both the lender and the borrowers, preferably recorded, and must be retained in the loan file.

- Failure to include the Affidavit of Affixture in the loan file may result in the loan being ineligible for delivery to Fannie Mae. If assistance is needed in preparing an acceptable affidavit, the lender should contact its lead Fannie Mae regional office.

Fannie Mae Selling Guide, B8-2-02.

## Certifications And Endorsements For FHA Insurance

84.    HUD requires Direct Endorsement Lenders to certify their compliance with the

foregoing due diligence, quality control, and reporting requirements.

85.    First, when a lender applies to participate in the Direct Endorsement Lender

program and to endorse loans for FHA insurance on HUD's behalf, the lender must certify that it

will fully comply with all HUD guidelines, regulations, and requirements:

> I certify that, upon the submission of this application, and with its submission of each loan for insurance or request for insurance benefits, the applicant has and will comply with the requirements of the Secretary of Housing and Urban Development, which include, but are not limited to, the National Housing Act (12 U.S.C. § 1702, *et seq.*) and HUD's regulations, FHA handbooks, mortgagee letters, and Title I letters and policies with regard to using and maintaining its FHA lender approval.

This certification is submitted to HUD headquarters.

86.    If the lender is approved, the lender must re-certify, every year, that it is

complying with the program's qualification requirements, including due diligence in

underwriting and the implementation of a mandatory quality control plan.  From 2007 to 2009,

the lender was required to certify:

> I know or am in the position to know, whether the operations of the above-named mortgagee conform to HUD-FHA regulations, handbooks, and policies. I certify that to the best of my knowledge, the above named mortgagee conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named mortgagee is fully responsible for all actions of its employees, including those of its HUD-FHA approved branch offices.

This language was altered in 2010, requiring the lender to certify:

25

> I certify that I know, or am in the position to know, whether the operations of the above-named lender conform to HUD-FHA regulations, handbooks, Mortgagee Letters, Title I Letters, and policies; and that I am authorized to execute this report on behalf of the lender. I certify that the lender complied with and agrees to continue to comply with HUD-FHA regulations, handbooks, Mortgagee letters, Title I Letters, policies, and terms of any agreements entered into with [HUD]. I certify that to the best of my knowledge, the above-named lender conforms to all HUD-FHA regulations necessary to maintain its HUD-FHA approval, and that the above-named lender is fully responsible for all actions of its principals, owners, officers, directors, managers, supervisors, loan processors, loan underwriters, loan originators, and all other employees conducting FHA business for the above-named lender. . . Each of my certifications is true and accurate to the best of my knowledge and belief. I understand that if I knowingly have made any false, fictitious, or fraudulent statement(s), representation, or certification on this form, I may be subject to administrative, civil and/or criminal penalties; including debarment, fines, and imprisonment under applicable federal law.

These certifications are submitted to HUD headquarters.

87.    Unless the lender submits a truthful initial certification and annual certifications, the lender is not entitled to obtain or maintain its status as a Direct Endorsement Lender or to endorse loans for FHA insurance.

88.    In addition, for each individual mortgage loan approved for FHA insurance, the lender must make a "loan-level" certification – *i.e.,* a certification specific to an individual loan – that the individual mortgage complies with HUD rules and is "eligible for HUD mortgage insurance under the Direct Endorsement program." Form HUD-92900-A.

89.    The "loan-level" certification differs depending on whether the lender used an AUS or manual underwriting. For each loan that was underwritten with an AUS, the lender must certify to "the integrity of the data supplied by the lender used to determine the quality of the loan [and] that a Direct Endorsement Underwriter reviewed the appraisal (if applicable). Id. For each loan that required manual underwriting, the lender must certify that the Direct Endorsement Underwriter "personally reviewed the appraisal report (if applicable), credit application, and all associated documents and ha[s] used due diligence in underwriting th[e] mortgage. Id.

26

90.     For all loans, the mortgagee's representative must certify: "I, the undersigned, as authorized representative of mortgagee at this time of closing of this mortgage loan, certify that I have personally reviewed the mortgage loan documents, closing statements, application for insurance endorsement, and all accompanying documents. I make all certifications required for this mortgage as set forth in HUD Handbook 40004.4."[3] Id. If the loan does not meet all applicable HUD requirements, it is not eligible for FHA insurance and cannot be certified for endorsement.

91.     Absent the applicable certifications for an individual loan as described in Paragraphs 85-90, the Direct Endorsement Lender cannot endorse that loan for FHA insurance.

92.     Each of the foregoing certifications is material to HUD's payment of any claim submitted under the Direct Endorsement Lender program. HUD does not review FHA loans for approval prior to the loan being endorsed for insurance or to paying claims in the event of a default; instead, it relies on its lenders to comply with HUD requirements and to ensure that every loan is in fact eligible for FHA insurance. The certifications are required for each lender to enter and remain in the program. The certifications are critical to HUD's ability to ensure that only qualified and eligible loans are endorsed for HUD insurance. The certifications are essential for a claim on a loan to be submitted for FHA insurance. And the certifications are needed to protect HUD and the FHA insurance fund from undue risk and loss.

## Defaulted Loans Result In Losses To HUD

93.     A loan endorsed by HUD, or the Direct Endorsement Lender, is insured by FHA on the basis that the Direct Endorsement Lender has followed the HUD requirements and has submitted accurate certifications and that the loan is eligible for FHA insurance. Without those requirements being met, the lender could not endorse the loan for FHA insurance. It is only

---

[3] As of May 9, 2009, HUD Handbook 4000.4 was superseded by HUD Handbooks 4155.1 and 4155.2.

because a lender endorses a loan for FHA insurance that the holder of the mortgage is able to submit a claim to HUD for any losses.

94.     If the borrower defaults, the holder of the mortgage can submit a claim to HUD for any loss from the default. The holder submits a claim for insurance by using HUD's electronic claim system. The claim must include certain information. Each loan that is endorsed for FHA insurance has a unique FHA case number, and the claim must include the FHA case number. If a valid FHA case number is not submitted with the claim, an insurance payment will not be processed on that claim. The claim also must include the identification number of the mortgagee inputting the claim, which must be either the holder of record or the servicer of record of the mortgage.

95.     FHA pays these insurance claims in two parts. First, the mortgage holder makes an initial claim for the unpaid principal on the loan, plus interest. Second, if applicable, the mortgage holder later makes a final claim for expenses and allowances (*e.g.*, foreclosure costs), plus interest. HUD Handbook 4330.4, REV-1, ch. 2-4.

96.     These claims are submitted to HUD electronically, and HUD's electronic system processes them automatically. The system ensures that the FHA insurance is active with respect to the FHA case number provided and that there are no other impediments to paying the claim. After processing, the claim is approved for payment, and a disbursement request is sent to the United States Treasury to issue the funds via wire transfer to the holder of the mortgage note.

### Direct Endorsement Lenders Owe Duties to HUD By Virtue Of Their Authority To Endorse Loans For FHA Insurance And Their Responsibility To Ensure Accuracy

97.     HUD grants Direct Endorsement Lenders responsibility for determining which loans qualify for FHA insurance. In granting this control and responsibility to the Direct Endorsement Lenders, HUD must rely on and place trust and confidence in the lenders'

knowledge, good faith, integrity, and candor. HUD therefore enters into a fiduciary relationship with the Direct Endorsement Lenders.

98. As a result of this fiduciary relationship, the Direct Endorsement Lenders owe HUD a duty to act with good faith, candor, honesty, integrity, fairness, and fidelity in their dealings with HUD. These duties require, among other things, that the lenders exercise integrity, prudence, candor, and due diligence on behalf of HUD when endorsing loans for FHA insurance.

## Gateway Directly Endorsed FHA Loans for Ineligible Borrowers Which Have Defaulted, Requiring FHA Pay Substantial Insurance Claims

99. Gateway Funding was a Direct Endorsement Lender with HUD during the relevant time period. In that capacity, Gateway Funding originated and underwrote loans it knew or should have known did not comply with FHA loan requirements, and falsely certified to HUD that it (1) had used due diligence in underwriting the loans; and (2) that the data it used to approve the loans for FHA insurance had integrity, and that the loans were eligible for FHA mortgage insurance. As described below, Gateway Funding knew or should have known that many of its loans did not comply with FHA's underwriting requirements and thus were not eligible for FHA mortgage insurance.

100. The loans Gateway Funding originated and underwrote that are the subject of this civil fraud action were used to purchase Mobile Homes not eligible for FHA mortgage insurance. Gateway originated these loans in a New Jersey community in which it had experience lending and knew or should have known contained significant numbers of Mobile Homes that did not qualify for FHA loan programs. Gateway knew or should have known the Geverd and keen houses were Mobile Homes. In originating these Mobile Home loans, Gateway profited by earning fees on loans that should not have been endorsed for FHA insurance.

101.    McCarthy, Terruso and DePalma Realty were material particpants in Gateway's

underwriting and settlement of the Geverd loan and the Keen loan. Each of them knew or should

have known Geverd's house and Keen's house were Mobile Homes. Each knew or should have

known that the Geverd and Keen properties were not eligible for FHA insurance. McCarthy,

Terruso and DePalma Realty knew or should have known that by not disclosing this material

information, they were causing a false statement to be made to HUD and causing a false claim

for payment to the Government.

## Gateway Funding Submitted Appraisals that
## Did Not Meet FHA Requirements

102.    Gateway is jointly responsible with its appraisers for the quality, integrity,

accuracy and thoroughness of appraisal reports. Gateway's appraisers, McCarthy and Terruso,

prepared appraisal reports that Gateway knew or should have known were not thorough and

accurate, and did not meet FHA underwriting standards. HUD 415.2 4.1.b. As set forth below,

the McCarthy and Terruso appraisal reports did not identify the properties as Mobile Homes.

Had McCarthy and Terruso prepared their appraisals consistent with HUD requirements, they

knew or should have known that the properties were Mobile Homes. Had they disclosed the

information in their appraisals, HUD would not have insured the loans.

## Laurel Lake Contains Numerous
## Mobile Homes and Manufactured Homes

103.    The Geverd house at 5758 Doris Drive, and the Keen house at 5301 Doris Drive

are within walking distance in Laurel Lake, New Jersey, a rural lake community in Commercial

Township, New Jersey. Commercial Township is one of the few places in New Jersey where

manufactured homes can lawfully be placed on lots outside of a designated manufactured home

park.

104.    Laurel Lake is a 15 square-mile area with approximately 3,000 residents. Its haphazard history of development has lead to a mix of housing types, including a significant number of mobile homes and manufactured homes.  It was initially developed in the 1920's as an inexpensive vacation community to Philadelphia residents of modest means.  Individual lots could be purchased for $69 in 1927.  Owners constructed two or three room summer cottages, that were gradually adapted for year round use by attaching trailers, adding small wood frame rooms, sheds and other simple structures.  The small houses became inexpensive year-round housing.  Owners also placed free standing mobile homes on their lots; Mobile Homes on foundations constructed prior to the HUD Codes; and in later years Manufactured Homes attached to foundations; as well as site built homes.

105.    Gateway operated an office in Vineland, New Jersey, a short drive from Laurel Lake.  Gateway originated and underwrote many loans in Laurel Lake, including conventional loans and FHA insured loans for the purchase of site built homes constructed according the HUD Minimum Property Standards, and Manufactured Homes constructed according to the HUD Codes.  Despite its extensive experience in Laurel Lake, Gateway repeatedly underwrote loans for ineligible Mobile Homes, using data from appraisals that did not correctly identify the properties.  Gateway certified to HUD the accuracy and completeness of its appraisals.

106.    Defendant DePalma Realty Real Estate is a local real estate company with long experience selling property in the Laurel Lake community.  The company principal, Larry DePalma, has spent most of his career selling real estate in the area, including Laurel Lake.  Mr. DePalma was quoted in a Philadelphia Inquirer article stating, with respect to Laurel Lake, that "[i]t's not uncommon for me, a few times a week, to show a house to people from out of state. The areas is now being looked at as a viable option for people."  Philadelphia Inquirer, Philly.com, posted January 19, 2004.

31

## DePalma Realty, DePalma and Martin Knowingly
## Withhold that Geverd's House is a Mobile Home

107.   DePalma Realty was hired by the prior owners of Geverd's house, Jeremy Greene and Rebecca Ferguson Greene, as their excusive listing agent to sell the house in January 2008. Sarah Martin was the listing agent. Martin prepared a MLS listing in which it stated the property was "Mobile Home w/Land." It also stated that the house was built in 1976 and was eligible for FHA financing. DePalma Realty caused the MLS listing to be published January 13, 2008.

108.   DePalma Realty received no offers on the property during the first three months of the listing. Martin changed the MLS listing in March 2008. The new listing removed 'Mobile Home w/Land" from the description of property type near the top of the page, and replaced it with "Single Family." The only reference to the property as a Mobile Home was moved to the "Remarks" section at the bottom of the listing, where in the middle of the narrative it stated, "DBL wide mobile, currently financed conventional[.]" The listing continued to state that the house was built in 1976. DePalma Realty caused the new MLS listing to be published on March 17, 2008.

109.   Geverd did not see DePalma Realty's MLS listing. She learned the house was for sale from a sign on the lawn. She contacted a family friend who was a realtor to arrange to see the house. After visiting it, she agreed to purchase the house for $115,000. She signed a purchase contract on September 10, 2008. The contract made no reference to the house being a Mobile Home or a Manufactured Home. However, it specified that the sale was contingent on Geverd being approved for an FHA loan. DePalma Realty signed the contract, along with Geverd and the Greenes.

## The Gateway Appraiser Does Not Identify
## Geverd's House as a Mobile Home in the Appraisal Report

110.     Geverd applied to Gateway for a mortgage loan to finance the purchase. She met personally with a Gateway representative and submitted a loan application on September 15, 2008. Gateway proposed an FHA loan in the amount of $113,805 at 6.6 percent interest.

111.     Gateway also submitted to HUD, through the AUS, information necessary to obtain a FHA case number to the Geverd Loan. HUD assigned the Geverd Loan FHA Case Number 351-525839 on September 23, 2008.

112.     Gateway hired defendant McCarthy to appraise the house. McCarthy knew Geverd was applying for an FHA insured loan. Gateway and McCarthy knew the appraiser was required to follow HUD appraisal requirements. Gateway and McCarthy also knew Gateway was obligated to select an appraiser with experience appraising properties in the local community and experience appraising the type of property.

113.     McCarthy failed to meet HUD requirements in preparing his appraisal. For example, HUD inspection requirements demand that appraisers inspect basements and crawl spaces.   As defined in the HUD Codes, manufactured homes are built upon a permanent chassis. The chassis is metal and supported by metal cross members. The metal chassis and cross members are visible from an inspection of the crawlspace. McCarthy's inspection of the crawlspace would have revealed the metal chassis and beams, the *sine quo non* of a Mobile Home or a Manufactured Home. That fact alone should have indicated to a qualified appraiser that the property was a Mobile Home or a Manufactured Home.

114.     Had McCarthy adhered to HUD requirements, inspected the crawl space and identified the property as a Mobile Home or a Manufactured Home, he would have been required to use the Manufactured Home Appraisal Report form rather than the Uniform Residential

Appraisal Report form. The Manufactured Home appraisal form would have required McCarthy to locate the information from the HUD Data Plate and the HUD Certification Label. There was no HUD Data Plate and no HUD Certification Label attached to the Geverd house. The absence of the HUD Date Plate and the HUD Certification Label should have indicated to a knowledgeable and experienced appraiser that the property was a Mobile Home. The HUD appraisal guidelines set forth additional requirements for the appraiser in the event the HUD Data Plate and/or HUD Certification Label are not present. The appraiser must obtain from the manufacturer the information required from the HUD Certification label. "To be eligible for FHA-insured financing, the manufactured home must have a HUD Certification label affixed to the tail-light section of each transportable section. If the appraiser is unable to locate the HUD Certification Label (HUD seal), the lender must be notified." Hud Handbook 4150.2 (Appendix D).

115.    In addition, the McCarthy appraisal states that Geverd's house was constructed in 1971. That fact, in combination with the information that should have been gathered from an inspection done in compliance with HUD requirements, should have identified the property as a Mobile Home. Nonetheless, McCarthy did not identify Geverd's house was a Mobile Home.

116.    McCarthy completed his appraisal report on September 23, 2008 and delivered it to Gateway on September 25, 2008. The Gateway DE underwriter electronically entered the information from McCarthy's appraisal into the FHA Appraisal Log on the AUS the following day. The underwriter stated to HUD in the FHA Appraisal Log that Geverd's house was not "Manufactured Housing." Had the Gateway Direct Endorsement underwriter stated the house was a manufactured home constructed in 1971, HUD would not have approved the loan for FHA mortgage insurance.

34

117. Gateway approved the Geverd Loan the same day. It issued a commitment to

provide her with an FHA 30-Year Fixed Rate loan in principal amount of $114,086 at 6.0%

"secured by the above-captioned property[.]" Geverd signed the Gateway loan commitment.

118. Gateway also warranted and certified to HUD that same day, that the Geverd loan

was in compliance with all investor/insurer rules, regulations and guidelines for the loan

program.

> I, THE UNDERSIGNED, HEREBY WARRANT AND CERTIFY THE
> INFORMATION/DOCUMENTATION USED TO OBTAIN THE AUS
> APPROVAL FOR THE LOAN AS BEING ACCURATE AND VERIFIED.
> FURTHER, THE LOAN IS IN COMPLIANCE WITH ALL
> INVESTER/INSURER RULES, REGULATIONS AND GUIDELINES FOR
> THE PROGRAM UNDER WHICH THIS LOAN WILL CLOSE. ALL
> CONDITIONS REQUIRED BY THE AUS APPROVAL DETERMINATION
> HAVE BEEN SATISFIED EXACTLY AS REQUIRED/OUTLINED WITHIN
> THE AUS DETERMINATION CERTIFICATE AND THESE CONDITIONS
> HAVE NOT BEEN CHANGED, MODIFIED OR ALTERED IN ANY WAY,
> EXCEPT AS ALLOWABLE BY THE TERMS OF THE CURRENTLY ISSUED
> BY THE INVESTOR TO WHOM THE LOAN WILL BE SOLD AND/OR THE
> LOAN INSURER, AS APPLICABLE. THE INTEREST RATE, LOAN
> AMOUNT AND LTV AT WHICH THIS LOAN WILL CLOSE ARE THE
> SAME AS THOSE INDICATED ON THE AUS APPROVAL.

> By: [Pam Funaro] Date: [September 26, 2008]

> (THIS FORM MUST BE SIGNED, DATED AND PLACED IN EACH LOAN
> FILE, WHICH RECEIVES AND AUS PPROVAL, BY THE INDIVIDUAL
> ISSUING THE APPROVAL. THE FORM MUST BE PLACED IN THE LOAN
> FILE JUST ATOP THE FINAL AUS APPROVAL USED FOR LOAN
> COMMITMENT.)

Gateway Funding Loan Certification dated September 26, 2008, signed by Gateway Funding

Direct Endorsement underwriter. (Capitalization in Original).

## Geverd Discovers Her House is a Mobile Home

119. Geverd closed on the Gateway loan without knowledge of the fact she was

purchasing a Mobile Home, and without knowledge of FHA property eligibility requirements.

Robert Geverd, her spouse, joined the Navy in February 2010, and was deployed to Kuwait in

August 2010. Before he departed, he was told that he would be stationed in Washington State when he returned in February 2011. Geverd put her house on the market when he departed for Kuwait and it remained on the market until March 2011without an offer. She reduced the price several times during this period. Robert Geverd returned from Kuwait and was stationed in Washington State in February 2011. Relator Geverd still had no offers when she relocated to Washington State to join him in March 2011.

120. Geverd was in contact with her loan servicer, Wells Fargo Bank, N.A., during this period. She advised Wells Fargo that she was reducing the price below the mortgage amount, and asked that she be approved to short sell the property in February 2011. In responding to her request for mortgage assistance Wells Fargo ordered an appraisal to determine the property's market value.

121. Wells Fargo hired Terruso to appraise the property in February 2011. It was Terruso's second time appraising 5758 Doris Drive. He had appraised the property for Bank of America when the Greenes purchased it in December 2000. Terruso did not identify the property as a manufactured home in his December 2000 appraisal.

122. Terruso also did not identify 5758 Doris Drive as a manufactured home in his second appraisal in February 2011. In his second appraisal, he did state that he observed a metal chassis above the crawlspace, but argued it did not demonstrate it was a manufactured home. He stated:

> The crawlspace was inspected and there was a metal chassis under the house. The tax assessors office has the home as a modular home and not a manufactured home. The interior of the home does not look like a manufactured home.
>
> * * * *
>
> There is the question of the subject's construction (metal chassis) but the township has it listed as a modular.

Terruso Appraisal to Wells Fargo, February 21, 2011.

123.  Terruso did not state how the reference in the tax assessor file would override his professional judgment and expertise. Nonetheless, Terruso rejected the evidence presented by the metal chassis, and used a Uniform Residential Report form for the appraisal.

124.  Wells Fargo did not inform Geverd that Terruso had reported her subfloor was a metal chassis. Meanwhile, she continued to try to sell the property. She received an offer to purchase the house in April 2011. The offer was timely as Geverd had not been able to make the mortgage payment due April 1, 2011. The buyer offered to purchase the property for $73,000, and the parties signed a contract on April 12, 2011.

125.  The purchase contract was terminated shortly after it was signed, however. The buyer's home inspector observed the metal chassis during his inspection and reported to the buyer that it was a manufactured home.  Geverd's realtor notified Geverd of the inspector's findings, as well as Gateway. Gateway was originating the buyer's loan application. It was the first time Geverd had learned that the house was a manufactured home. Gateway terminated the buyer's loan application, stating it was doing so because "property manufactured home."

126.  Wells Fargo chose not to rely upon Terruso's appraisal. Instead, it hired another appraiser, Metro Appraisal Services. The Metro Appraisal Services appraiser inspected Geverd's house and determined it was a manufactured home. The appraiser prepared his report using a Manufactured Home Appraisal Report form. It also reported to Wells Fargo that it had not been able to locate the HUD Data Plate or the HUD Certification Label. It delivered its appraisal to Wells Fargo September 12, 2011.

127.  The Geverd loan has been in default since April 2011. Geverd has submitted two subsequent short sale offers to Wells Fargo. In both instances HUD reviewed the proposed short sale contract. HUD rejected one contract when the purchaser withdrew the offer, and a second

37

contract because the offer price was too low. Upon information and belief, HUD is now the lender and mortgagee on the Geverd loan after Wells Fargo submitted a claim to HUD under the FHA mortgage insurance and Government paid the claim from the FHA insurance fund.

## Gateway Originates Another FHA Insured Loan for a Mobile Home

128.    Gary Keen contracted to purchase 5301 Doris Drive in Laurel Lakes New Jersey in August 2008. The contract price was $115,000. Lawrence DePalma and defendant DePalma Realty represented the seller, Michael Maguire.

129.    Keen applied to Gateway Funding for a loan to purchase the property on September 29, 2008. Gateway hired Terruso to prepare the appraisal. Terruso, as well as DePalma, knew Keen was applying for an FHA insured loan. Terruso and Gateway knew the appraiser was required to follow HUD appraisal requirements. Gateway and Terruso also knew Gateway was obligated to select an appraiser with experience appraising properties in the local community and experience appraising the type of property.

130.    Terruso appraised Keen's house using a Uniform Residential Appraisal Report form. HUD regulations required Terruso to inspect the basement and crawlspace. In his report, Terruso described the property as a bungalow built over a crawlspace constructed in 1972. He did not identify the property as a Mobile Home or a Manufactured Home.

131.    Terruso stated in his report that he obtained information concerning property taxes and prior transactions from the New Jersey County Tax Boards Association ("NJACTB"). The NJACTB website provides tax assessment and other property related information. Included in the information is a description of the property taken from the most recent town-wide assessment. The tax assessor's description has no legal consequence. However, it does provide information. The tax assessor description for 5301 Doris Drive states it is a mobile home. Terruso chose to ignore the tax assessor information for 5301 Doris Drive. Relator has

conducted further investigation into the dwelling at 5301 Doris Drive, and confirmed the tax assessor description - - it is a manufactured home.

132.    Gateway applied for an FHA Case Assignment Number for the Keen's loan on August 5, 2008. The Keen loan was assignedFHA case number 351-5207931.

133.    Terruso delivered his appraisal of 5301 Doris Drive to Gateway on October 15, 2008. Gateway entered the information from the appraisal into the AUS system that day. Gateway did not identify the property to HUD as a manufactured hom. That same day, Gateway issued a conditional loan commitment for an FHA insured loan to Keen. Gateway did not identify the property as manufactured housing in the commitment.

134.    Gateway issued its in-house loan approval on October 28, 2008. The loan was for an FHA 30 year fixed rate loan (GN 30 FCY 001) in the amount of $103,075. The same loan program it used for Relator Geverd.

135.    The loan transaction closed on October 30, 2008. Gateway, Terruso and DePalma Realty each earned fees as part of the loan transaction.

136.    Keen subsequently defaulted on the mortgage. Wells Fargo, as Keen's loan servicer, commenced foreclosure proceedings against Keen and the property in August 2013. A Final Judgment of Foreclosure was entered December 17, 2014. Upon information and belief, Wells Fargo has submitted a claim to HUD under the FHA mortgage insurance and the Government paid the claim from the FHA fund.

## COUNT I

### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(2006) and 31 U.S.C. § 3279(a)(1)(A)(2010)

137. Plaintiff Relator Shanna Geverd repeats and realleges the allegations contained in

Paragraphs 1 – 136 above, as if fully set forth herein.

138. Finance of America, Gateway, McCarthy, Terruso, Martin, DePalma and

DePalma Realty violated the False Claims Act, 31 U.S.C. § 3729(a)(1)(2006) and 31 U.S.C. §

3279(a)(1)(A)(2010), by knowingly presenting and causing to be presented to HUD false and/or

fraudulent claims for payment.

139. The United States paid the false and/or fraudulent claims because of Finance of

Amcrica, Gateway, McCarthy, Martin, DePalma and DePalma Realty's acts and incurred

damages as a result.

## COUNT II

### Violation of the False Claims Act
### 31 U.S.C. § 3729(a)(1)(B)(2010)(formerly 31 U.S.C. § 3729(a)(2)(2006))

140. Plaintiff Relator Shanna Geverd repeats and realleges the allegations contained in

Paragraphs 1 – 136 above, as if fully set forth herein.

141. Finance of America, Gateway, McCarthy, Terruso, Martin, DePalma and

DePalma Realty violated the provisions of the False Claims Act, 31U.S.C.

§3729(a)(1)(B)(2010)(formerly 31 U.S.C.§3729(a)(2)(2006)) by knowingly making, using, or

causing to be made or used, false records, or statements: (i) material to false or fraudulent claims

for payment to HUD; and/or (ii) in order to get false or fraudulent claims paid; and (iii) which

claims the United States did pay.

142.     The United States paid the false or fraudulent claims because of Finance of

America, Gateway, McCarthy, Terruso, Martin, DePalma and DePalma Realty's acts and

incurred damages as a result.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Relator Shanna Geverd, by and on behalf of the United States of

America, prays for judgment against the Defendants as follows:

A.     As to Counts I and II under the False Claims Act, 31 U.S.C. § 3729(a), against

Defendants Finance of America, Gateway, McCarthy, Terruso, Martin, DePalma and DePalma

Realty, for treble the amount of the United States' single damages to be proven at trial, plus civil

penalties as are required by law in the amount of $5,500 to $11,000 per violation of the False

Claims Act, post-judgment interest, costs, and such other relief as may be necessary and proper;

B.     Such other relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Relator Shanna Geverd, by and on behalf of the United States of America,

demands a trial by jury as to all issues so triable.

Dated:  July 31, 2015

Respectfully submitted,

LAW OFFICE OF ROOSEVELT N. NESMITH, LLC

By: _____
          Roosevelt N. Nesmith, Esq.

363 Bloomfield Avenue, Suite 2C
Montclair, New Jersey 07042
*Attorney for Plaintiff Relator Shanna Geverd*